**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ALICE OUTLAW MCMILLAN,<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. POTTER, Postmaster General,<br><br>Defendant. | No. 06 CV 2121<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

**I. BACKGROUND**

In 1985, Plaintiff Alice Outlaw McMillan ("McMillan") began working as a clerk for the United States Postal Service ("USPS"). In keeping with the spirit of her middle name, McMillan claims to have a long history of standing up for her rights and those of other injured employees, referring to herself as a modern-day "Norma Rae."[1] Between 1994 and 2004, McMillan filed ten ("Equal Employment Opportunity") EEO complaints against the USPS.

In May 1994, McMillan filed a claim for an on-the-job injury (apparently the onset of carpal tunnel syndrome), which was accepted by the Office of Workers' Compensation ("OWC"). As a result, McMillan was placed in a mail processing clerk position, a limited-duty post with certain restrictions. Those restrictions included not lifting more than one pound, no repetitive motion with both hands, and no stamping, pushing or pulling. During this period, Plaintiff

---

[1] Defendant claims that this fact is immaterial and unsupported by the evidence, however it is relevant to McMillan's claims of retaliation.

maintains that she periodically worked in the "Nixie" unit in order to rest her hands.[2]

By October 2002, McMillan claimed that her injury was so severe that she could no longer work. The OWC accepted her work stoppage, and McMillan was placed on temporary disability leave and received disability payments.

In September 2003, McMillan had surgery on her right knee and subsequently underwent physical therapy. In February 2004, USPS, through Injury Compensation Specialist Sheila Spane ("Spane"), offered McMillan placement into a limited-duty clerk position. McMillan's treating physician, Dr. Samuel Chmell, responded to the offer, rejecting it. He explained that McMillan would not be able to return to work until September 1, 2004.

In March 2004, Spane once again offered McMillan a limited-duty clerk position. Dr. Chmell again rejected the offer explaining that McMillan was fully incapacitated for duty. On March 29, 2004, Spane requested that the OWC schedule McMillan for a second opinion examination.

On September 27, 2004, Dr. Chmell wrote McMillan a work statement explaining that she would be unable to work through October 10, 2004, and would be released to work on October 11, 2004, with the following restrictions: no repetitive motion, no cold air blow, no push/pull, no lifting of more than one pound, no "SS" walking. On October 6, McMillan went to the USPS Medical Unit to obtain the necessary clearance to return to work. Personnel at the Medical Unit expressed concern about McMillan's medical release authorization. McMillan then contacted Dr.

---

[2] Although not thoroughly explained by the parties, it appears that the Nixie unit is one "where employees restricted to 'light duty' for non-work related injuries and 'limited duty' for work-related injuries are typically assigned because the work is not strenuous." *Mannie v. Potter*, 394 F.3d 977, 979 (7th Cir. 2005).

Chmell who provided, via fax, an updated release. The release reported McMillan's diagnoses as "bilateral knee injuries status post right knee partial menisectomy, consequential injuries to ankles and feet with posterior tibial tendinitis." Dr. Chmell also specified the following restrictions: no excessive walking; no repetitive motion of the upper extremities; no lifting of more than one pound; no cold blowing air; and no pulling or pushing. According to Defendants, this differed from the earlier restrictions in that McMillan could not undertake any excessive walking. Carol Moore, then head of the Injury Compensation Department, advised the Medical Unit that McMillan was to be scheduled by the Department of Labor ("DOL") for a referee examination. Spane notified the Medical Unit that as a result of the "conflicting" medical information submitted by Dr. Chmell,[3] McMillan would not be able to return to work until a referee examination had taken place and the results were returned. After the examination, the DOL, through the OWC, could then advise the USPS as to whether McMillan could return to work.

On October 12, Plaintiff spoke with Angela Eaddy ("Eaddy"), her claims examiner at OWC. Eaddy explained that Spane had called her to let her know that the agency did not have any work within the restrictions prescribed by her physician, but she denied directing Spane not to return Plaintiff to work. In January 2005, OWC then sent a letter to McMillan summarizing that she had already been advised by Eaddy that there was no work available at USPS within the

---

[3] I note here that in her deposition testimony, Spane explained that the "conflict" warranting a referee exam was between the restrictions in Dr. Chmell's September 27, 2004 letter and his February and March 2004 evaluation that Plaintiff was incapacitated. However, in his briefing, Defendant explains that the new work limitations specified by Dr. Chmell in September and October 2004 "conflicted" with the limitations previously agreed to by McMillan in November 2001. According to Plaintiff, the 2004 restrictions differed from the 2001 restrictions in that the 2004 restrictions included a prohibition on excessive walking. Plaintiff maintains that this difference is not a "conflict."

restrictions set forth by Dr. Chmell, and that the OWC would schedule a referee examination to determine whether McMillan had any residual injuries and whether she could return to work.

In April 2005, Dr. David Hoffman conducted the referee examination. He concluded that McMillan was not totally disabled, and, that at the time of the examination, she would be able to perform the limited-duty clerk position that had been offered to her in March 2004. In February 2006, McMillan returned to work at the USPS, accepting an assignment as a Manual Unit employee. From October 2004 through February 2006, during her period of unemployment, McMillan received temporary total disability payments totaling approximately $100,000.

On or around July 7, 2003, McMillan contacted Senator Richard Durbin about the Postal Service's improper treatment of her on-the-job injury. On October 20, 2004, Plaintiff sent a letter to Postmaster John Potter complaining of her treatment by Spane and Moore. Also in October 2004, Plaintiff sought EEO counseling, and a formal administrative complaint of discrimination against the USPS followed one month later. In her complaint, McMillan alleged that she had been prevented from returning to work in October 2004 because of a disability and in retaliation for prior EEO activity. The Equal Employment Opportunity Commission ("EEOC") granted the USPS's motion for summary judgment.

In April 2006, McMillan filed suit, challenging the EEOC's rejection of her claims. In her Third Amended Complaint, Plaintiff alleges that in October 2004, the Medical Unit informed her that there was no work available for her within her restrictions. According to McMillan, this was a discriminatory and retaliatory act by Spane, Moore, or their supervisors, one or more of whom McMillan claims made the decision to deny her accommodation. McMillan contends that she was denied "a position for which she was qualified and eligible solely by reason of her disability." She

4

claims that the USPS placed other similarly situated employees in these positions shortly after denying them to McMillan. She also maintains that there were several available positions in the Nixie unit at the time she was denied a position. McMillan brings the following counts against her employer, the United States Postal Service: (1) failure to accommodate; (2) disparate treatment, (3) retaliation. In her response to Defendant's motion for summary judgment, Plaintiff dismissed Count 2.

Plaintiff is seeking lost wages, insurance premiums she paid while out of work, accrual benefits, and compensatory damages for negative health effects suffered as a result of the uncertainty she faced while out of work.

## II. DISCUSSION

### A. Whether FECA Bars Plaintiff's claims

In his reply brief, Defendant raises the issue that Plaintiff's claims are barred under the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101, et seq.[4] The court in *Gantner v. Potter*, No. 3:03CV-644-S, 2007 WL 3342305, at *3 (W.D. Ky. 2007), provides a helpful summary of duties under FECA:

---

[4] Defendant argues that Plaintiff's claims are moot since McMillan has already successfully litigated before the DOL her disability, pay and work assignments under the FECA, receiving $100,000. This argument is raised for the first time in Defendant's reply and is not thoroughly treated. After a hearing, this Court ordered supplementary briefing (n the form of a sur-reply and sur-sur-reply) on this issue as well as on the issue of damages.
    In his sur-sur-reply, Defendant moves to strike Plaintiff's supplemental exhibits submitted in support of her damages claim and against Defendant's FECA argument. This motion is denied. Defendant did not challenge Plaintiff's damages claim or raise the FECA issue in his motion, but did so for the first time in his reply brief. I ordered supplemental briefing on these matters, and Plaintiff submitted the exhibits at issue in connection with my order. Her submission of these exhibits is appropriate in light of the circumstances.

> [FECA] provides for the payment of workers' compensation benefits to civilian officers and employees of all branches of the Government of the United States. *See* 20 C.F.R. § 10.0. The Department of Labor's Office of Workers' Compensation Programs (OWC) administers the FECA and is required to provide for limited duty jobs to accommodate employees with compensable job-related injuries. *See* 20 C.F.R. § 10.507. The OWC is responsible for determining if the limited duty job offered to the employee is "suitable work," and makes such determination based on an evaluation of the employee's physical limitations and all medical evidence concerning the employee's injury. *See* 20 C.F.R § 10.500 *et seq*. If the modified position is deemed to be suitable work by the OWC and the injured employee accepts the position, she can continue to receive compensation benefits. However, if the injured employee refuses to accept a modified position deemed suitable by the OWC, she will not be entitled to receive compensation benefits unless she can show just cause for such refusal. *See* 20 C.F.R § 10.517.

Defendant maintains that because the decision to create a limited-duty position for a postal worker is made by the DOL, and because Plaintiff successfully litigated her disability claims under FECA before the DOL, her claims pursuant to the ADA are barred. According to Defendant, because McMillan had applied to the DOL for a temporary limited-duty position, she cannot now maintain that she was entitled to return to a permanent limited-duty position.

Plaintiff maintains that the USPS's duties are not limited to its FECA obligations, and that the USPS is still required to act in accordance with the Rehabilitation Act. Moreover, she is not challenging the USPS's compliance with FECA, but rather its compliance with Rehabilitation Act. Plaintiff also responds that she was not seeking the creation of a limited-duty position, but rather the return to a limited-duty position that she already held. According to Plaintiff, at the time she went on medical leave in October 2002, she was working in the Nixie unit, the very same unit to where she returned in February 2006 and where she remains to this day. However, in her response to Defendant's first set of interrogatories, Plaintiff provides several apparently inconsistent details in response to a question regarding her previous employment at the USPS. She explains that from

6

1985 to 1986 she was employed as an LSM operator; from 1996 to 2001 she worked in the Nixie unit; from 2001 to 2004 she was a flatsorter operator; and from 2006 to present she has been employed as a manual unit employee. The job descriptions of the flatsorter operator and the manual unit position, the positions she held in 2002 and 2006, respectively, are different, and she has listed different supervisors for each position. Plaintiff contends that she was simply seeking to return to the same position she previously held, but her interrogatory answers suggest that she came back to work in a different capacity. It is unclear from the record (1) whether these two positions are Nixie unit positions; (2) whether she was temporarily placed in the Nixie unit while working in these two positions; and (3) whether positions in the Nixie unit can be permanent.[5] Without knowing the answers to these questions it is difficult to ascertain whether or not Plaintiff was returned to the same position she held prior to her leave, and whether her current claims are foreclosed by her FECA claim.

## B. Failure to Accommodate

In order to sustain a failure-to-accommodate claim under the Rehabilitation Act, McMillan must show that the Postal Service knew of her disability and still refused to take action that could have kept her working. *Bellino v. Peters*, 530 F.3d 543, 548 (7th Cir. 2008). Put another way, McMillan has to show that (1) her injury makes her a "qualified individual with a disability"; and

---

[5] At the hearing, Defendant did explain that positions in the Nixie unit are temporary and are created and qualified through FECA. However, as discussed *infra*, in note 7, this is inconsistent with the theory that it cannot be liable for failure to accommodate where there was no work available within Dr. Chmell's restrictions. This theory seems to suggest that the USPS did not create a position, but rather waited until a pre-existing, permanent position became available. Plaintiff maintains that there are permanent positions within the Nixie unit.

(2) the Postal Service knew of the disability; but (3) nonetheless failed to make a "reasonable accommodation." *Id*.[6]

The questions of fact surrounding the nature of Plaintiff's current and former positions and her time in the Nixie unit, discussed *supra*, are also significant within the context of Plaintiff's Rehabilitation Act claim. Courts outside of this circuit have held that where a limited- duty position is created by an employer in order to satisfy its duty under FECA, the rescission of that position is not a denial of a reasonable accommodation under the rehabilitation act. *Gantner*, 2007 WL 3342305, at *4; *Luckiewicz v. Potter*, 670 F. Supp. 2d 400, 409-10 (E.D. Pa. 2009). In these two cases, the courts cited to precedent holding that an employer's obligation to reasonably accommodate an employee does not require the creation of a new job. In *Luckievicz*, when measuring whether the plaintiff was qualified to perform the essential functions of her job, the court looked to the plaintiff's initial position, not her subsequent limited-duty position. Defendant maintains that McMillan has failed to present any evidence that she was qualified to hold any position at the Post Office in October 2004.

Plaintiff, however, points to *Winston v. Potter*, in which the court noted that: "Once an employer places an injured employee on limited duty, the employee's qualifications must be measured in relation to the limited duty position occupied, not the position formerly held." No. 01 C 2349, 2004 WL 3119834, at *5 (N.D. Ill. Dec. 1, 2004).[7] In support, the court cited *Hendricks-*

---

[6] The standards set out in the ADA are used in evaluating a claim under the Rehabilitation Act. *Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003); 29 U.S.C. § 794(d).

[7] Defendant attempts to distinguish this case by arguing that McMillan was not on limited-duty at the time she sought to return to work and that she had in fact been incapacitated. Defendant seems to be suggesting that once McMillan went on leave, her position basically disappeared, but points to nothing in the record to support that. When she left, she went on temporary total

8

*Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir. 1998), where the Seventh Circuit noted that its "case law and the EEOC's interpretation of the ADA have approved of an employer's offer of light-duty assignments as a reasonable accommodation for injured workers." There the Court found a genuine issue of fact as to whether or not the limited-duty positions at issue in that case were "temporary." The issue was material because if the positions were in fact temporary, the employer was not required to convert them into permanent ones for employees that are permanently restricted. *Id.* However, if the positions were permanent jobs, then the employee's assignment would be treated as a permanent reassignment for the purposes of an ADA accommodation. *Id.*

This case involves similar issues. Without an understanding of how Plaintiff's last two positions were created, whether they were intended to be temporary, how much time she spent in the Nixie unit, and whether all positions in that unit are temporary, this Court cannot determine whether or not her USPS "failed to accommodate" her, or whether there were any vacant funded positions available at the time she sought her accommodation. In essence, Defendant is arguing that because Plaintiff's latest position had to be created by DOL, USPS cannot be liable for failing to accommodate. Plaintiff argues that the position already existed and was available at the time she sought to return to work. This is a question of fact, and summary judgment is inappropriate at this time.

---

disability. It appears that when McMillan did finally return to work, she stopped collecting her benefit. Defendant points to nothing in the record that indicates that McMillan's position was created. In fact, Defendant's argument that there was no work available within Dr. Chmell's restrictions seems to suggest that the USPS did not create a position, but rather waited until a pre-existing, permanent position became available. This question of fact is relevant to whether Plaintiff's claims are barred by FECA, and whether Defendant failed to accommodate plaintiff.

Defendant maintains, in the alternative, that it did in fact make reasonable accommodations on two occasions by offering to place Plaintiff in limited-duty positions with additional physical restrictions. After refusing both of these offers, Defendant contends Plaintiff cannot sustain this claim. Plaintiff counters that these offers were made seven months prior to her request for accommodation and while she was still incapacitated. When she finally did request an accommodation, she was refused one for 16 months.

Pursuant to the ADA, employers must engage with the employee in an "interactive process to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (citation and quotations omitted). "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown[.]" *Id.* However, an employer's failure to engage in this process cannot be a basis for relief if the employer can demonstrate that no reasonable accommodation was available. *Id.* (citation omitted). Generally, a plaintiff seeking a judicial remedy for the employer's failure to accommodate bears the burden of showing that a reasonable accommodation existed. *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir.2002); *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir.2001) (same). But where an employer fails to consult with the employee concerning a possible accommodation, the burden shifts to the employer to show the unavailability of a reasonable accommodation. *Mays*, 301 F.3d at 870.

In an analysis to determine which party, if any, was responsible for the breakdown of the interactive process, courts may first examine "whether there is a genuine issue of material fact regarding the availability of a reasonable accommodation, and if it is clear that no reasonable accommodation was available," the analysis is over. *Sears*, 417 F.3d 789 at 805. In this case,

there is a genuine issue of material fact as to whether reasonable accommodations were available at the time at issue.  In January 2005, the OWC sent a letter to Plaintiff reflecting that she had already been advised by the USPS that there was no work available within the restrictions prescribed by her doctor.  Plaintiff maintains that there were two or three cubicles and numerous table positions available in the Nixie unit in October 2004.  Plaintiff testified that she noticed the spaces when she visited the unit in early October 2004, and she provides the corroborating testimony of a coworker.  Moreover, according to McMillan, four or five other postal employees who had similar injuries and physical restrictions were given positions by USPS after October 2004, indicating that perhaps limited-duty positions were indeed available.  Defendant maintains that there is no evidence that she ever applied for a position in the Nixie unit on October 2004.  But this is not relevant to the issue of whether there were available positions in that unit, and Defendant points to no case law that requires a plaintiff to apply for each individual position for which she may be qualified.

Plaintiff maintains that it was the USPS that caused the breakdown of the "interactive process," and that the burden has shifted to Defendant to show that no accommodation was available.  Spane informed Plaintiff that she would not be allowed to return to work until after the referee examination.  But it wasn't until February 2006, nearly a year after the referee examination, that McMillan was offered an assignment as a Manual Unit employee.  Plaintiff points to inconsistencies in the record on the issue of why she was not returned to work from October 2004 through January 2006.  In her EEO affidavit, Spane maintains that it was Moore who made the decision.  In her affidavit, Moore contends that it is the DOL which "has the authority to advise the agency if and when an employee can return to work based on the results of the [referee] examination."  Eaddy's notes, the January 2005 OWC letter, and a November 22, 2005 DOL decision suggest that it was the employing agency that was responsible for the decision.

11

In any event, there is a question of fact as to who was responsible for the breakdown. USPS made two offers of accommodation in February and March 2004, when Plaintiff was still incapacitated. She obtained notes from her doctor in an effort to explain and clarify her medical situation. Once she did request an accommodation, there was little evidence that USPS engaged "in a flexible give-and-take [with Plaintiff] so that together they [could] determine what accommodation would [have enabled Plaintiff] to continue working." *Sears*, 417 F.3d at 805. Spane told Plaintiff that the OWC would not allow her to return to work, and Plaintiff submitted to the referee examination. That seems to have marked the end of any "interactive process" that might have been in effect at the time. There is virtually nothing in the record that indicates any communications between USPS and Plaintiff regarding the possibility of accommodation until Plaintiff returned to work in February 2006. Spane maintains that this was because of Moore's instruction that McMillan could not return to work until the referee exam was conducted. But there is no evidence of an interactive process even after the April 2005 referee exam.[8] Because an employer cannot be liable for a breakdown where it can demonstrate that no reasonable accommodation was available, the issue here hinges on the nature of Plaintiff's current and former positions, her time at the Nixie unit, and whether the limited-duty positions held by Plaintiff were temporary. As discussed *supra*, these are questions of fact that render summary judgment inappropriate here.

## C. Retaliation

Section 504 of the Rehabilitation Act, at 29 U.S.C. § 794(d), expressly incorporates the

---

[8] Defendant maintains that the process was delayed "due in part to McMillan raising additional FECA claims[,]" but points to nothing in the record that supports this assertion or corroborates the reason for delay.

anti-retaliation provision of Section 503 of the ADA, 42 U.S.C. § 12203, prohibiting retaliation against "any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Id.* Therefore, in order to succeed on a retaliation claim under Section 504, a plaintiff must establish that: (1) she engaged in a statutorily-protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two events. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). This is known as the direct method of proof. A plaintiff may prevail under this method by "construing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker." *Sherrill v. Potter*, 2008 WL 4086980 *5 (N. D. Ill. August 25, 2008) (quoting *Nichols v. Southern Ill. Univ.*, 510 F.3d 772, 782 (7th Cir. 2007)). Such circumstantial evidence may include "suspicious timing, ambiguous statements and patterns demonstrating differing treatment of similarly situated employees." *Id.*

Alternatively, McMillan may establish retaliation using the indirect method under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show the following: (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing her job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004); *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

From her response, it appears that Plaintiff is proceeding under the direct method of proving retaliation. In her Third Amended Complaint, Plaintiff alleges retaliation based upon her

13

request for accommodation. Defendant maintains that her claim is somewhat paradoxical since McMillan is alleging that her request for accommodation to be the protected activity and the refusal of such accommodation to be the retaliation. Defendant also contends that a claim made pursuant to the FECA for the creation of a limited-duty position is not a protected activity. 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(a); *Mosley v. Potter*, 2007 WL 1100470 * 9 (S.D. Tex. Apr. 11, 2007); *Johnston v. Henderson*, 144 F. Supp.2d 1341, 1354, n. 5 (S.D. Fla. 2001).

Plaintiff counters that requesting an accommodation is a protected activity that may support a claim for retaliation. *Garza v. Abbott Laboratories*, 940 F. Supp. 1227, 1244 (N.D. Ill. 1996).

She claims that her reputation as a modern day "Norma Rae," her ten EEO complaints against the USPS between 1994 and 2004, her October 2004 letters to the Postmaster, and her July 2003 letter to Senator Richard Durbin regarding her injury are all grounds for a retaliation claim. She characterizes these actions as fights for accommodation and against discrimination, and therefore, protected activities.

Based on the evidence before me, I find that there is a question of fact as to whether Plaintiff was retaliated against, but I must note the weakness of Plaintiff's case. Plaintiff argues that taken together, she presents a "convincing mosaic of circumstantial evidence" allowing for the inference of discrimination. It is true that there are some inconsistencies in the record on the issue of why she was not returned to work from October 2004 through January 2006. Defendant did on two previous occasions offer Plaintiff accommodations does weigh against Plaintiff, but at the time Plaintiff had not been cleared to work by her physician, she had not requested the accommodation, nor had she written the letters to the Postmaster, in which she complains specifically about Moore and Spane. The record demonstrates that Spane and Moore did see the letters to the Postmaster and Senator Durbin, which does help to establish a causal connection, but there is little evidence

that they actually knew of the EEO claims,[9] nor is there any evidence of the outcome of those EEO claims. There is no indication of animus on the part of the USPS, and McMillian provides no evidence that other similarly-situated employees who did not file claims were treated more favorably. In fact, there is evidence in the record that two of McMillan's disabled colleagues - Essaquena Harris and Ruth Thomas - had both filed EEO complaints on more than one occasion, and yet both were accommodated by being placed in Nixie positions. Although her claim seems particularly weak in light of the offers of accommodation, Plaintiff's eventual reinstatement, and the fact that similarly situated colleagues who had filed EEO claims were accommodated, there remains a question of fact as to this claim. For this reason, Defendant's motion for summary judgment on Plaintiff's retaliation claim is denied.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: April 29, 2010

---

[9] Defendant argues that a claim based on the letters and previous EEO actions is inappropriate as "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). However, this seems less like an attempt to amend the complaint and more like a fleshing out of the facts that emerged during discovery. Plaintiff is not attempting to add new Defendants or claims.

15